DECISION
Relator, Thomas L. Gyarmati, has filed this original action in mandamus requesting this court to issue a writ of mandamus ordering respondent Industrial Commission of Ohio to vacate its order granting termination of his temporary total disability compensation, declaring an overpayment, and finding fraud on the part of relator.
This court referred the matter to a magistrate, pursuant to Civ.R. 53(C) and Loc.R. 12(M) of the Tenth District Court of Appeals, who issued a decision, including findings of fact and conclusions of law. (Attached as Appendix A.) The magistrate concluded that relator had failed to establish that respondent-commission had abused its discretion and that this court should deny the requested writ.
Relator filed objections to the decision of the magistrate essentially rearguing issues that had already been adequately addressed in that decision. For the reasons stated in the decision of the magistrate, the objections are overruled.
Following independent review, pursuant to Civ.R. 53, we find that the magistrate has properly determined the pertinent facts and applied the salient law to them. Accordingly, we adopt the decision of the magistrate as our own, including the findings of fact and the conclusions of law contained in it. In accordance with the decision of the magistrate, the requested writ is denied.
Objections overruled; writ of mandamus denied.
BOWMAN and DESHLER, JJ., concur.
 APPENDIX A IN MANDAMUS
Relator, Thomas Gyarmati, filed this original action in mandamus asking the court to issue a writ compelling respondent Industrial Commission of Ohio to vacate its order granting a motion filed by the Bureau of Workers' Compensation seeking termination of his compensation for temporary total disability ("TTD"), a declaration of overpayment, and a finding of fraud. Relator asks for a writ ordering the commission to deny the motion in whole or in part.
Findings of Fact:
1. On June 26, 2000, Thomas Gyarmati ("claimant") sustained an industrial injury, and his workers' compensation claim was allowed for sprains of the lumbosacral spine and upper right arm. Claimant's job in a carpet warehouse involved heavy lifting.
2. In early July 2000, claimant submitted a C-84 form requesting TTD compensation. When asked whether claimant was able to perform light duty or alternative/modified work, the treating physician did not answer.
3. On July 13, 2000, a physician at "Tri-Health" released claimant to work with these restrictions: no lifting over twenty pounds, no sitting more than thirty minutes, and no lifting above chest height.
4. TTD compensation was awarded.
5. Prior to and following his injury, claimant was active in an organization called Intense Wrestling, Inc., which presented professional wrestling shows every other Saturday. In a written statement, claimant admitted that he was responsible for "all aspects" of running each Intense Wrestling show. He purchased and sold concessions, contracted with wrestlers, paid sales taxes and admittance taxes, participated in planning story lines and choreography for the wrestlers, and participated in promoting the shows. Intense Wrestling had a school, where claimant assisted in training wrestlers. At the shows, he performed as a wrestler and as a referee, and served as an announcer for wrestling matches on occasion.
6. Claimant acknowledges that, prior to his injury, he wrestled as three characters: Eki Motto, Ike Jones, and The Unpredictable Jomott. When performing as Eki and Ike, he wore a mask and/or hood, but he wrestled without a mask or hood as Jomott. Claimant admits that, after the injury, he stopped wrestling as Jomott, the only character in which his identity was recognizable, but that he continued to wrestle as Eki and Ike. However, in his Jomott character, he performed as a referee after the injury.
7. On July 28, 2000, claimant signed another C-84 form, and the medical portion was apparently completed by Edmund Schweitzer, M.D., who certified that claimant was unable to perform any light duty work or alternative/modified work.
8. In August 2000, claimant's treating physician was Daniel Reilly, M.D., who reported a shoulder condition resulting from the industrial injury. Dr. Reilly noted that claimant was "involved with part-time Professional Wrestling and reports no injury to his shoulder in that activity."
9. The employer initiated an investigation of claimant's activities. On August 26, 2000, a private investigator attended the Intense Wrestling show and reported that claimant, as Jomott, was the referee for three matches, which involved physically demanding activities such as picking up and throwing a wrestler and also getting on his knees and slamming his right arm against the mat while giving a count. During another match, Jomott was initially an observer but jumped into the ring to help the referee, pulled two men apart, and threw a wrestler aside. Claimant was observed using his right arm to hold a wrestler and shove him against a ring post.
10. Based on Dr. Reilly's opinion, claimant filed a motion to allow a shoulder condition. A bureau nurse noted Dr. Reilly's comment regarding professional wrestling and sought further information.
11. On September 9, 2000, bureau investigators attended a show and videotaped claimant's performances as a wrestler and referee. Their report describes physically demanding activities by claimant.
12. On September 21, 2000, Dr. Reilly certified TTD to October 31, 2000.
13. On September 23, 2000, bureau investigators attended a show at which claimant wrestled as Eki Motto and Ike Jones.
14. On October 7, 2000, bureau investigators attended a show at which claimant wrestled as Ike Jones, refereed a match, wrestled as Eki Motto, had another match as Eki Motto, and had another match as Ike Jones. A videotape of several shows is included in the record.
15. Between August 5, 2000, and October 21, 2000, claimant performed regularly as a wrestler and referee, according to Intense Wrestling's website.
16. On October 17, 2000, bureau investigators interviewed claimant, who initially denied being involved in any wresting activities since his injury, alleging that he had only been a referee for two women's matches. However, after further discussion, claimant conceded that he had performed as a wrestler. He made this statement:
"Since [the industrial injury] I have been collecting temporary total benefits.
"Since my injury I have wrestled as Eki Motto and Ike Jones in Pr ice Hill at IWI (Intense Wrestling, Inc.).
"I have announced at one wrestling match in Elkton, Michigan.
"I have referreed [sic] about three matches since my indus trial injury.
"Any mention of Ike Jones or Eki Motto since my date of injur y was actually me wrestling.
"I wrestled as these individuals in order to save money. I could not afford to pay more wrestlers because we were not drawing a big enough crowd to cover costs.
"I am responsible for all aspects of running each IWI show. I purchase concessions, contract wrestlers, etc. never paid myself for w restling.
"I pay applicable taxes, sales and admittance taxes.
"I assist in training wrestlers but do not perform strenuous moves.
"I performed these wrestling activities so that the IWI show would go on and hopefully survive until winter. During the winter months the crowds tend to grow and we could make money.
"Last show we lost $300. We can't afford to keep losing money."
17. On October 19, 2000, investigators again spoke with claimant, who admitted to wrestling in Michigan and provided a videotape.
18. On October 26, 2000, the bureau filed its investigative report including photographs and videotape showing claimant performing in professional wrestling shows during the period he received TTD compensation. The bureau filed a motion for termination of TTD, declaration of overpayment, and a finding of fraud.
19. In December 2000, a district hearing officer found that claimant had been employed in the operation of a business called Intense Wrestling, Inc., during which time he received TTD compensation. The order included the following findings:
"The * * * Bureau of Workers' Compensation Report of Investigation documents the Claimant's activities in the operation of the wrestling business. In addition, the Claimant testified at hearing, corroborating the details of the Bureau of Workers' Compensation report. The Claimant testified that, during the period from 06/27/2000 to 10/30/2000, he coordinated the wrestlers for the wrestling events, paid the wrestlers, purchased the concessions and wrestled and refereed himself at some matches. The Claimant also admitted paying sales and admittance taxes. The Claimant also acknowledged the existence of a wrestling school. He denied actually teaching at the school, but he stated that he would watch his son teach the wrestling students and offer pointers to the son and students on specific wrestling methods. The Claimant testified that he did not receive money for his activities with the wrestling matches or school. On direct examination, the Claimant testified that all money that was received was funneled back into the business.
"* * * The Claimant's physician, Dr. Schweitzer, certified that the Claimant was disabled from performing his former position of employment and also, on some C-84's, that the Claimant could not perform light duty work. However, during this period, the Claimant performed the physical work of wrestling and referr[ee]ing, as well as the administrative duties of running the wrestling business. * * *" However, the district hearing officer did not find fraud.
20. On February 3, 2001, an investigator attended an Intense Wrestling show, reporting two matches by "Iki Moto" and observing claimant selling T-shirts.
21. In February 2001, the medical file and videotape of claimant's wrestling were reviewed by V. Mannava, M.D., who reported:
"The videotape of the wrestling matches * * * [is] very detailed in these [claimant] is noted to participate in the matches fully, without any limitations or restrictions of either the right shoulder/arm or lumbosacral area. For example, he was able to use the right upper extremity to * * * hold right upper extremity overhead holding the opponent and turn himself and or the opponent 180° — a significant activity even with a normal shoulder, [and] slam, punch, lift, * * * arm lock, etc., repeatedly without any restrictions.
"Similarly during these matches, he was noted to have dropped flat on back from complete standing like a log, body slammed, jump off rope onto opponents, jumped on the stage and land flat on buttocks with the weight of the opponents, jump off from flat or supine position, arching the spine during a count, etc.
"SUMMARY: These activities and many other moves noted but not described-even after considering that these matches were faked-did involve significant R. O. M., force, vibration, repetitiveness and extraordinary movements of body parts, involving both his right upper extremity and trunk, including his L.S. spine area.
"* * *
"1. The activities shown on the videotape of the claimant wrestling was completely inconsistent with the alleged disability * * * .
"2. Even after considering the fact that these were not true wrestling matches, the movements of the body parts including total abduction, flexion and circumduction of [right upper extremity] and flexion, hyperextension, twisting, landing on buttocks, flat on back, etc., cannot be achieved with restrictions of light duty * * *.
"3. A[l]most all the moves noted, even if they are in fake wrestling, are very harmful to any injured person * * * with the R shoulder and lumbosacral condition. These activities not only can cause/result in the said condition, [but] can and will significantly alter and prolong the course of recovery to the worse."
22. In February 2001, on administrative appeal, a staff hearing officer concluded that claimant's activities did not constitute employment.
23. On further appeal, the commissioners held a hearing in March 2001. They concluded that claimant engaged in employment while receiving TTD and acted in a fraudulent manner:
"* * * The Industrial Commission finds that the claimant is overpaid temporary total disability compensation from 06/27/2000 to 10/30/2000. The Industrial Commission further finds that the claimant committed fraud. * * *
"The claimant signed and then filed C84 forms that certified temporary total disability compensation from 06/27/2000 to 10/30/2000. Based upon these C84 forms, the Bureau of Workers' Compensation paid temporary total disability compensation. But during this period, the claimant was extensively involved with `Intense Wrestling Inc. (IWI).'
"With a small group of friends, the claimant planned, promoted, and arranged two `wrestling shows' per month. The claimant planned shows on Sunday mornings, when future plot lines were established. Promotion included advertising and IWI's own web page at www.intensewrestling.com. The web address includes an `intense store' and information regarding employment with IWI. For each show, the claimant hired wrestlers, arranged for workers to collect the $7.00 admission fee, and arranged other workers to sell food, drink, and concessions. The claimant also paid sales taxes, property taxes, and a City of Cincinnati admission tax. In his written statement of 10/17/2000, the claimant confirmed that he was responsible for `all aspects' of each IWI show.
"While the claimant admitted to the above administrative duties, the claimant also admitted that he performed as three separate-charter wrestlers and as a referee. The Bureau of Workers' Compensation obtained videotape evidence that detailed the intricate physical movements employed by the IWI wrestlers. The claimant testified that the wrestling was not as physical as it seemed. He specifically compared the wrestling matches to dance. Accepting this analogy, the choreography between the wrestlers must have taken much planning and practice.
"The claimant also admitted that he participates in IWI's `Intense School.' The claimant stated that two current students pay $30 per week for one night of instruction in wrestling techniques. This school is held at the same location as most wrestling matches-the Intense Arena. The claimant further admitted that the Intense Arena was the former home of the Workhouse Gym and that the building is presently owned by his wife. With regard to the Intense School, advertising indicated that it was a `complete pro wrestling school' with instruction in `technical, mat, high flying, brawling, and hardcore.'
"The claimant attempted to explain his extensive involvement with IWI as his hobby. He stated that the group only uses the `Inc.' in their name as an advertising ploy-the group has not filed for incorporation with the Secretary of State. The claimant further explained that very few individuals receive compensation. Money collected from the gate and from the sale of concessions is allocated to out-of-state wrestlers and to the expenses incurred from the arena operation. But in his 10/17/2000 statement, the claimant stated that he saved money by wrestling himself. The claimant explained that larger crowds were expected in the winter months and IWI `could grow and we could make money' if expenses were met until then. Thus, the claimant voluntarily limited his income from IWI.
"The claimant's time commitment with IWI was said to be six hours one week and two hours the next. However, this only involved the preparation for the bimonthly shows. The claimant did not detail his time involvement with the Intense School or any type of training schedule.
"Finally, the claimant compared IWI to a Community Theatre Troupe and children's sport league. Like these examples, IWI collected money, allegedly, to only cover costs. Yet, the claimant did not prove that IWI is a not-for-profit enterprise and the claimant did not describe what value IWI gave to the community. Lacking such evidence, the Industrial Commission rejects the analogy between IWI and either a Community Theatre Troupe or a children's sport league.
"Instead, the Industrial Commission finds the claimant's work with IWI to be analogous to Mr. Blabac's work as a scuba instructor. State ex rel. Blabac v. Indus. Comm. (1999), 87 Ohio St.3d 113. While receiving [TTD] * * * Mr. Blabac continued to instruct paying students in the mechanics of scuba diving. Mr. Blabac's partner performed all the physical instruction and Mr. Blabac's involvement was limited to less than four hours per week. * * *
"Although the claimant did not submit any financial or tax records, he testified that he has not earned wages. Given its intricate planning and promotion, the Industrial Commission finds that IWI, along with the Intense School and the Intense Arena, are businesses. Further, relying upon the wage loss case, State ex rel. Ooten v. Siegel Interior Specialist Company (1998), 84 Ohio St.3d 255, the Industrial Commission finds that the lack of wages does not negate the finding that IWI is a business or that the claimant is working. The Industrial Commission relies upon the claimant's testimony, his 10/17/2000 statement, the videotape and photographic evidence to support the above. Marketing IWI over the internet, selling IWI merchandise, performing in IWI shows, and training others is much more than free time devoted to a hobby.
"Accordingly, the Industrial Commission finds that the claimant worked while receiving * * * compensation from 06/27/2000 to 10/30/2000. Temporary total disability compensation is overpaid for this period. And for the reasons that follow, the Industrial Commission orders this overpayment collected pursuant to O.R.C. 4123.511(J)(4).
"Specifically, the Industrial Commission finds reliable, probative, and substantial evidence that the claimant committed fraud, i.e., he knowingly used deception to collect temporary total disability compensation. The prima facie elements of fraud are: 1) a representation, or where there is a duty to disclose, concealment of fact; 2) which is material to the transaction at hand; 3) made falsely, with the knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred; 4) with the intent of misleading another into relying upon it; 5) justifiable reliance upon the representation or concealment; and 6) a resulting injury proximately caused by the reliance.
"The Industrial Commission finds that the claimant failed to disclose his work for IWI. The claimant alleged that he informed his coworkers, doctors, and physical therapist about his wrestling. Yet, he neither informed the Bureau of Workers' Compensation nor management personnel at his place of employment. Furthermore, his disclosure to his medical providers only involved his physical activities and did not include specific information as to his employment.
"Failing to disclose his employment was a material omission. Had the Bureau of Workers' Compensation known of the claimant's involvement with IWI, temporary total disability compensation would not have been paid.
"Next, the Industrial Commission finds that the claimant knew, or should have known, that he could not collect temporary total disability compensation and work for IWI. The claimant signed his C84 forms and indicated that he was not employed. He endorsed his temporary total disability compensation checks under the warning that he was not entitled to same if he was working. Thus, the Bureau of Workers' Compensation provided ample notice to the claimant that he was not eligible for temporary total disability compensation if he was working. Instead, the claimant ignored these warnings and attempted to collect temporary total disability compensation. The claimant explained that he defined work or self-employment as activities that generate a wage. Since the claimant manipulated IWI's revenues and did not pay himself a wage, he rationalized his involvement as a hobby. But, Ooten, id., explains that self-employment often does not result in a wage. Moreover, such circumstances do not negate the fact that the claimant was working.
"The Industrial Commission further finds that the claimant intended to mislead the Bureau of Workers' Compensation. First, the claimant admitted that he wrestled as three separate characters. But after his injury, he dropped one character from his repertoire. He stated that this character was much more physical and he could no longer play the part. Yet of the three characters, only the discontinued character was recognizable as the claimant. The two remaining characters wore hoods and concealed the claimant's identity. Regarding the claimant's argument that he could not physically perform as the unmasked character, the review by Dr. Mannava, dated 02/26/2001, found all wrestling activities to be inconsistent with total disability. Dr. Mannava even opined that the wrestling maneuvers could worsen the claimant's condition.
"Next, the Industrial Commission notes that the claimant initially denied his employment with IWI. Not until Bureau of Workers' Compensation investigators confronted the claimant with the videotape evidence did the claimant admit to his extensive involvement with IWI.
"Finally, the Industrial Commission finds that the Bureau of Workers' Compensation justifiably relied upon the C84's and paid temporary total disability compensation. The claimant stated on his C84's that he was not employed and the Bureau of Workers' Compensation paid without knowing that the claimant was actually working.
"Accordingly, the above analysis establishes that the claimant committed fraud * * *." Mr. Gannon dissented in part, disagreeing with the finding of fraud.
24. Claimant applied for reconsideration, filing evidence, including an affidavit in which he stated, among other things, that he spent only about six hours with Intense Wrestling during show weeks and about two hours during a non-show week. Claimant emphasized the openness of his activities. In response, the employer submitted an affidavit from claimant's foreman. The commission denied reconsideration.
Conclusions of Law:
Claimant argues that the commission abused its discretion in finding that he was employed and in finding that his receipt of TTD compensation was fraudulent.
First, it is well established that a claimant cannot receive TTD compensation while gainfully employed. E.g., State ex rel. Peabody Coal Co. v. Indus. Comm. (1993), 66 Ohio St.3d 639; State ex rel. Durant v. Superior's Brand Meats, Inc. (1994), 69 Ohio St.3d 284; State ex rel. Johnson v. Rawac Plating Co. (1991), 61 Ohio St.3d 599; State ex rel. Blabac v. Indus. Comm. (1999), 87 Ohio St.3d 113; Greathouse v. Indus. Comm. (1993), Franklin App. No. 92AP-1390. The question as to whether claimant was employed is a question of fact for the commission to determine. Greathouse, supra.
Gainful employment of an occasional or sporadic nature may nonetheless bar receipt of TTD compensation. Durant. The number of hours per week may be minimal, the pay nominal. Blabac. Where a claimant is no longer able to perform his heavy work after the industrial injury, but is was able to perform lighter part-time work, claimant was not entitled to TTD).The issue before the commission was whether claimant was involved in business activities for gain, not whether he realized any gain or whether the gain was substantial. See Greathouse (stating that claimant's argument that his business did not return a profit was not determinative of the issue); Blabac (rejecting the argument that claimant's receipt of nominal income did not preclude payment of TTD compensation).
Further, where the claimant operates the business in which he is employed, he has substantial control over its records. Thus, the absence of income in the form of wages or salary need not be a persuasive factor. See State ex rel. Brown v. Indus. Comm. (1998), Franklin App. No. 97APD11-1452; see, also, State ex rel. Dawson v. Indus. Comm. (1998), Franklin App. No. 97APD11-1544, (concluding that lack of wages does not preclude finding of gainful employment). See, also, Ooten, supra.
In addition, this court has rejected the argument that claimants were not engaged in gainful employment because the activities were merely managerial and did not involve strenuous physical labor. E.g., State ex rel. Nahod v. Indus. Comm. (1999) Franklin App. No. 98AP-1157 (denying writ where commission determined that claimant was not only the owner but also managed and operated the business); State ex rel. Kasler v. Indus. Comm. (1996), Franklin App. No. 95AP-341 (noting that work need not include physical labor in order to preclude eligibility for TTD). Therefore, the commission may conclude that entrepreneurial activities are gainful employment. Nahod, supra; see, also, State ex rel. Schultz v. Indus. Comm. (2000), Franklin App. No. 00AP-166 (a permanent total disability case). In short, involvement to the extent of making sales or assisting in operating the business may be viewed as gainful employment. See Nahod, supra; State ex rel. Rousher v. Indus. Comm. (2000), Franklin App. 99AP-286.
In Rousher, supra, the claimant insisted that his involvement with Pete's Match Sales was merely a hobby, not a business. He characterized his financial involvement as an investment, asserting that he reinvested any returns back into more matchbooks. Although there was evidence that claimant was a collector who engaged in wholesaling of matches merely to fund his hobby, there was also evidence that he acted as a distributor for a match company, solicited sales, made sales presentations, took orders, arranged shipments, etc. The commission decided that claimant was gainfully employed rather than engaging in a hobby or investing, and the court denied a writ.
In the present action, claimant also argues that his activity was merely a hobby. However, the commission cited extensive evidence to support its conclusion that Intense Wrestling was a business and that claimant participated in all aspects of operating it. The commission cited evidence that he made sales, contracted with wrestlers, planned shows, coordinated workers, paid taxes, and performed as a referee and wrestler. Even when one accepts that claimant's performances were not "real" wrestling but merely performing, this fact does not negate or contradict the finding that claimant's activities constituted employment. Claimant's activities in planning, promoting, selling, managing and performing were sufficient to constitute gainful employment even if those activities were fun, and even if they were less strenuous than the warehouse work.
Likewise, the lack of evidence of wages does not preclude a finding that claimant was gainfully employed, especially given the finding that claimant handled funds for Intense Wrestling, reimbursing expenses and paying taxes. In short, the finding of gainful employment was supported by the evidence cited by the commission.
In its discussion of fraud, the commission identified the elements and burden of proof correctly, and it reviewed in detail the evidence that supported its finding as to each element. It expressly rejected claimant's asserted reason for wrestling after the injury only when masked, finding that claimant deliberately ceased his unmasked wrestling to hide his post-injury activities as a professional wrestler. While this interpretation was not the only one that could be drawn from the evidence, the interpretation was within the commission's discretion. See, generally, State ex rel. Pass v. C.S.T. Extraction Co. (1996),74 Ohio St.3d 373; State ex rel. Teece v. Indus. Comm. (1981),68 Ohio St.2d 165; State ex rel. Burley v. Coil Packing, Inc. (1987),31 Ohio St.3d 18.
The commission particularly relied on claimant's initial denial of the truth when questioned. Further, although claimant notified one doctor about a part-time activity with professional wrestling (in connection with seeking an additional allowance), claimant's information to that doctor was limited, as the note shows no awareness of the demanding nature of claimant's activities nor any knowledge of claimant's activities as a promoter, planner, manager, contractor, salesman, etc. Indeed, none of the doctors who certified TTD indicated awareness of the extremely demanding physical activities in which claimant was engaging, nor of his entrepreneurial activities. In its order, the commission also reviewed the various formal notices to claim ant that he could not be employed while receiving TTD.
As noted above, the evidence was susceptible to interpretation. A reasonable finder of fact could believe claimant's assertions and give heavy weight to exculpatory factors, or could find the exculpatory evidence unconvincing and give weight to evidence showing fraud. A reasonable person could find that claimant, knowing that his activities would disqualify him from receiving TTD, tried to conceal the full extent of his activities. In sum, the record included reliable, probative, and substantial evidence which, if accepted by the finder of fact, was suffi cient to prove the elements of fraud.
Accordingly, the magistrate recommends that the commission deny the requested writ of mandamus.